In re AMDURA CORPORATION; Amdura National Distribution Company, fka FOK; CoastAmerica Corporation; Coast To Coast Holdings, Inc.; Coast To Coast Stores, Inc.; and Intertrade Cargo, Inc., Debtors.

Bankruptcy Nos. 90 B 03811 E through 90 B 03816 E.

United States Bankruptcy Court, D. Colorado.

July 6, 1990.

On Motion to Clarify Order July 19, 1990.

Gerald F. Munitz, James L. Nachman, Winston & Strawn, Chicago, Ill., Stephen W. Seifert, Caroline C. Fuller, Fairfield and Woods, Denver, Colo., for debtors.

James S. Bailey, Jr., Calkins, Kramer, Grimshaw & Harring, Denver, Colo., for Official Unsecured Creditors' Committee of Amdura Corp.

## ORDER ON STATUS OF WINSTON & STRAWN AND FAIRFIELD AND WOODS, P.C. AS COUNSEL FOR THE DEBTORS–IN–POSSESSION

CHARLES E. MATHESON, Chief Judge.

This matter is before the Court *sua sponte.* The Court convened a hearing to consider whether the orders previously en- tered by the Court pursuant to the provi- sions of 11 U.S.C. § 327 appointing the law firms of Winston & Strawn ("W & S") and Fairfield and Woods ("F & W") as counsel for the Debtors-in-possession in these joint- ly administered proceedings should be with- drawn.

The history leading to the filing of these bankruptcy proceedings is reflected in the memorandum filed by W & S and F & W. Background has also been provided from the file and from the evidence presented at the various hearings filed by the Debtors seeking authorization to use cash collat- eral. Because the factual background is important to the resolution of the matters before the Court, some review of the perti- nent facts is necessary.

Amdura Corporation ("Amdura") is a holding company. It owns 100% of the outstanding stock of six corporate subsidi- aries and 57% of a seventh subsidiary. Two of those subsidiaries, Amdura Nation- al Distribution Company ("ANDCO") and CoastAmerica Corporation ("CoastAmeri- ca") are wholly owned subsidiaries of Am- dura. CoastAmerica also holds all of the outstanding stock of the Debtor, Coast to Coast Holdings, Inc., which in turn holds all of the outstanding stock of Coast to Coast Stores, Inc. ("Coast"). Coast, in turn, has five wholly owned subsidiaries, one of which, Intertrade Cargo, Inc. ("In- tertrade"), is also a debtor. Of the six debtors, ANDCO and Coast are the pri- mary operating companies.

In December 1988 Amdura entered into an agreement with Continental Bank ("Continental") providing for a credit ar- rangement of $265,000,000. Loans made to Amdura pursuant to that agreement were secured by, among other things, the stock and receivables of Amdura. In addition the debt was guaranteed by ANDCO and Coast. Those guarantees were secured by the accounts receivable of the subsidiaries. The Debtors inability to come to a satisfac- tory accommodation with Continental on the repayment of the bank loans led to the filing of the bankruptcy petitions.

On April 2, 1990, six separate bankruptcy petitions were filed for the six debtors.

They then sought, and were granted, an order providing for the joint administration of these estates.

On April 3, 1990, the Debtors filed ten separate applications to employ various professionals. Among those were applications to employ W & S and F & W under general retainers to act as counsel to all six Debtors-in-possession. Affidavits were filed as required by Bankruptcy Rule 2014 disclosing that both firms had, in the past, represented Continental and that W & S represented Continental on an ongoing basis in matters not related to Amdura. The firms also disclosed, tacitly by the filing of the six applications, their representation of all of the Debtors and the existence of various intercompany claims. Orders were entered granting the applications to employ counsel on April 6, 1990.

Because of the multitude of professionals being retained to represent the Debtors and the three committees that have been appointed (in Amdura, Coast and ANDCO, respectively), the Court requested counsel to consider a unified procedure for fee applications. A proposed order was submitted to the Court. That order contemplated payment of a portion of the fees on an unallocated basis. This was ostensibly done to recognize that certain services provided by Debtors' counsel might benefit all Debtors on a common basis. It was suggested that such time would not be specifically allocated among the separate debtors by counsel, but would be allocated at the time of payment proportionate to the payment of other legal fees incurred during the same period of time.

The Bankruptcy Code contemplates, pursuant to the provisions of sections 330 and 331, that fees will be allowed for services which benefit a debtor's estate. The Court was concerned with the proposed order's allocation scheme and its relationship to the standards under section 330 of the Code. That concern led to questions about potential conflicts, particularly for counsel representing multiple related debtors in bankruptcy proceedings. The Court, thereupon, convened the hearing for purposes of considering the propriety of the fee order and to reconsider the propriety of the orders that had entered appointing W & S and F & W as counsel for the Debtors herein.

The Creditors' Committee for Amdura ("Amdura Committee") has stated its position that W & S, and perhaps F & W, failed to meet the qualification standards mandated by section 327 of the Code and has urged the Court to enter an order revoking the appointment of those firms as counsel. The Creditors' Committee for Coast is more equivocal, as is Continental, preferring to wait and see how the case develops, reserving the right to raise the conflicts issue in the future. The Creditors' Committee for ANDCO urges that no change be made. All recognize that a change in counsel now would be disruptive and expensive.

The issue of counsels' qualification under section 327 is now squarely before the Court. The law in this area is not particularly complex. The application of the law to a particular factual scenario is where the difficulty lies. As the Court observed at the hearings, it appears from reading the cases that what most often gives rise to opinions in this area is not the application of section 327 of the Code but rather the efforts by the courts in seeking to find justification for not applying the strict mandate of the statute.

An analysis must start with the provisions of the statute itself, particularly section 327. That section specifies that the debtor-in-possession (the "Trustee"), with the Court's approval, may employ attorneys that do not "hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the Trustee in carrying out the Trustee's duties under this title." 11 U.S.C. § 327(a). The statute itself defines "disinterested," in section 101(13). Essentially that section would disqualify counsel who themselves hold an interest which might be affected by the bankruptcy proceedings. The term "adverse interest" is not specifically defined by the Code.

A statutory analysis cannot end with just those provisions of the Code which particularly concern the appointment of professionals. For example, when a corporation

files a bankruptcy petition the corporation is the "debtor." 11 U.S.C. § 101(12). If it is a Chapter 11 case, the debtor is also the "debtor-in-possession" unless a separate trustee is appointed. 11 U.S.C. § 1101(1). If a separate trustee is not appointed, the debtor-in-possession has the powers and generally performs the functions of the trustee. 11 U.S.C. § 1107.

The debtor-in-possession has the authority to hire an attorney pursuant to 11 U.S.C. § 327. In doing so, despite any other limitations imposed by section 327 of the Code, the law provides that an attorney is not disqualified "solely because of such person's employment by or representation of the debtor before the commencement of the case." 11 U.S.C. § 1107.

As to the professionals it has been said that:

> As a general principle, professional persons employed by the trustee should be free of any conflicting interest which might, in the view of the trustee or the bankruptcy court, affect the performance of their services or which might impair the high degree of impartiality and detached judgment expected of them during the administration of a case. *Collier on Bankruptcy,* ¶ 327.03 at p. 327–22 (L.King Ed.1985), cited with approval in *Roger J. Au & Son, Inc. v. Aetna Insurance Co.,* 64 B.R. 600 (N.D.Ohio 1986).

*See also In re Ginco, Inc.,* 105 B.R. 620 (D.Colo.1988); *In re Kendavis Industries International, Inc.,* 91 B.R. 742 (Bankr.N.D.Tex.1988).

Consider the role of the attorney, however. On the one hand, he is admonished that he must represent no conflicting interests. On the other, the Code itself creates nearly irreconcilable conflicts.

As noted above, the same attorney can represent both the debtor and the debtor-in-possession. It is the debtor which is given the exclusive ability to file a plan of reorganization during the first 120 days of the bankruptcy proceeding. 11 U.S.C. § 1121. And the Code clearly contemplates that the debtor can negotiate with the creditor groups to reduce or reallocate amounts flowing to creditor classes in order to effect a plan. In doing so, the debtor may even seek to preserve values to equity security holders when the "fair and equitable rule" would otherwise deny their participation. 11 U.S.C. § 1129(b). Does this not inherently place counsel in the position of representing conflicting interests? See, e.g., Ayer, *How to Think About Bankruptcy Ethics,* 60 American Bankruptcy Law Journal, 355, 391 (1986). One commentator has stated, in recognizing the inherently conflicting interests counsel is to represent:

> I believe it to be substantially impossible to fully and fairly represent, as debtor-in-possession, the interests of the estate, the creditors, and the equity owners. Thus there is an inherent conflict in attempting to fulfill fully the duties of a trustee as well as the duties of a Chapter 11 debtor-in-possession. While this is not ethically unacceptable, it does seem to require the debtor-in-possession (and its counsel) to confront the nature of the tension and to be fair and open about which side of the line it is coming down on. Sigal, *Representation of Debtors-in-possession and Trustees—Disinterestedness and Adverse Interest Standards,* Publication at the 63rd Annual Meeting of the National Conference of the Bankruptcy Judges, p. 8–27.

The cases in this area are legion. They were catalogued at length in the opinion issued by the bankruptcy court in Utah in the case of *In re Roberts,* 46 B.R. 815 (Bankr.D.Utah 1985); reversed in part, 75 B.R. 402 (D.Utah 1987). More recent cases of significance are the *Kendavis* decision, *supra,* and the decisions of the courts in *In re Lee,* 94 B.R. 172 (Bankr.C.D.Cal.1989) (counsel could not represent both the debtor and its principal shareholder who was also a debtor); and *In re Global Marine, Inc.,* 108 B.R. 998 (Bankr.S.D.Tex.1987) (the existence of intercompany claims between parent and subsidiary does not create an actual conflict of interest so as to bar counsel's representation of both).

For this Court the most important opinion is that of *Ginco, supra.* The *Ginco*

decision involved a ruling of this Court appointing, as special counsel to the trustee for purposes of prosecuting a lender liability suit, an attorney who also represented the debtor's principal shareholder. This Court authorized such an appointment because of a view that the trustee and the shareholder had a common interest in prosecuting the litigation against the bank, although the Court recognized the existence of a potential conflict of interest in allocating damages.

The District Court in *Ginco* set aside the order of appointment. Citing section 327 of the Code, the court noted the stringent adverse interest test imposed by the statute when it stated:

An attorney may not "hold or represent an interest adverse to the estate" in *any* matter. In the pending state litigation FMTG [the attorney] already represents Richard Ginder—the principal shareholder, officer and debt-guarantor of the corporation. Mr. Ginder may have an equity interest in Ginco and is a potential target for claims of corporate mismanagement. Under those circumstances, dual representation by FMTG of the estate and Mr. Ginder is a sufficient conflict to be an adverse interest under both subsection (a) and subsection (e). *Ibid* at 621.

The court rejected the concept of distinguishing between an actual present conflict and a potential conflict. The court admonished that the literal language of the Bankruptcy Code must be respected and followed.

The District Court's opinion in *Ginco* may have been softened somewhat by the opinion of Chief Judge Finesilver in the *Matter of W.V.S. Investment Joint Venture*, Civil Action No. 89–F–331 (D.Colo. January 4, 1990), but only to the extent of saying that an attorney can represent dual clients where their interests are common in the matter for which the attorney is retained.

Counsel for the Debtors in this case have discussed the application of the Attorney's Code of Professional Responsibility. Certainly those standards apply and must be considered by the Court. *In re Sixth Avenue Car Care Center*, 81 B.R. 628 (Bankr. D.Colo.1988). However, the Court must also recognize that activities and multiple representation that may be acceptable in commercial settings, particularly with the informed consent of clients, may not be acceptable in bankruptcy. *In re Ginco, supra; In re Roberts, supra; In re Kuykendahl Place Associates, Ltd.*, 112 B.R. 847 (Bankr.S.D.Tex.1989).

Section 327 of the Code does not permit excusing the limitation of those provisions by waiver or by the trustee's consent to the representation of dual interests. *In re Kuykendahl, supra.* The attorney must be "disinterested" and must not "hold or represent an interest adverse" to the estate. The explicit limitations contained in the statute reflect Congressional concerns with what it perceived to have been past abuses. *In re Ginco, supra.* It also recognizes that what may be acceptable in a commercial setting, where all of the entities are solvent and creditors are being paid, is not acceptable when those entities are insolvent and there are concerns about intercompany transfers and the preference of one entity and its creditors at, perhaps, the expense of another. *In re Kendavis, supra*, 91 B.R. at 756. In the final analysis the question under section 327 is one of fact. This Court has been reluctant to set down bright line tests in this area and has rested its past decisions on an evaluation of all of the various factors. *In re Sixth Avenue Car Care Center, supra.* Such an approach is appropriate here.

The most significant factor before the Court is the role of Continental and its relationship to the Debtors, to W & S and to F & W. Continental has been the lead lender. It entered into a loan agreement with Amdura pursuant to which, at the time of filing, the bank was owed approximately $215,000,000. That loan was guaranteed by the Amdura subsidiaries and those subsidiaries, particularly ANDCO and Coast, pledged their accounts receivable as security for those guarantees. Thus, the Continental loan permeates the Debtors' financial conditions and the satis-

faction of that loan will be one of the most significant factors to be dealt with in this reorganization case.

Continental is and has been a client of W & S, although it is clear that W & S did not represent Continental in any way in connection with the Amdura loans. While no evidence was submitted on the question, it appears that Continental is more than a casual nonmaterial client of the firm, for Mr. Munitz referred to Continental as being "the hand that feeds" the firm.

Continental has also been a client of F & W. Again, however, F & W did not represent the bank in connection with the Amdura loans. Further, F & W does not presently represent Continental in any matters.

There have been suggestions in this case that the Continental loan transaction should be investigated. However, Mr. Munitz has advised the Court that because of their other relationships with Continental neither W & S nor F & W could undertake such an investigation nor could they initiate or prosecute any claims against Continental if any were found to exist. Instead, the Debtors urged the Court to appoint an examiner for the purpose of carrying on such an investigation. Also, W & S has argued that if claims against Continental are found to exist, either separate counsel could be engaged to prosecute such claims or the creditors' committees could do so.

W & S argues that section 327(c) of the Code, which was not applicable to nor considered in *Ginco*, permits W & S and F & W to represent the Debtors in these cases, notwithstanding the fact they have also represented Continental. Pursuant to section 327(c), counsel who has represented a creditor may also represent the debtor-in-possession unless the Court finds that there is an actual conflict of interest.

The Court does not believe that section 327(c) is applicable. First, the Court believes that section only applies when counsel has represented a creditor in connection with a debt owed by the debtor and then seeks to represent the trustee or debtor-in-possession in the case. Such dual representation is permissible where there is no actual conflict; i.e., a trade debt incurred in the ordinary course of business and as to which there is no dispute. Dual representation of interests of that type is clearly not the case here.

The question here is one of whether counsel are "disinterested." The statutory definition of "disinterested" promotes the "policy that professionals should be free of the slightest personal interest which might be reflected in their decisions concerning matters of the debtors' estate." *In re Kuykendahl Place Associates, Ltd.*, supra, 112 B.R. at 850. The Court questions whether counsel can be said to be disinterested when they acknowledge their inability to take a position contrary to Continental because, at least as to W & S, it is unwilling to offend the "hand that feeds."

Nor is the Court as sanguine as Debtors' counsel that this is a problem that can be solved by utilizing separate counsel or by turning the matter over to an examiner or the committees. The Court acknowledges that this is an approach worthy at least of consideration if we were dealing with a dual representation of a debtor and a discrete secured creditor such as General Electric Credit Corporation ("GECC") where there are not interlocking interests, where the size of the debt is relatively small and where the collateral is clear. The resolution of the claims of GECC in these proceedings will not be the lynch-pin of the case. By comparison, the resolution of the Continental claims may very well prove to be of such significance. How can counsel fairly and fully advise the Debtors in negotiating with Continental and in drafting a plan if they are unable, or at least unwilling, to espouse positions detrimental to the interests of the bank? To ask the question would appear to supply a rather clear answer.

Consideration must also be given to counsel's representation of the six related corporate entities. Prepetition, Amdura was the borrower from Continental, which is to say it drew down the loan proceeds as funds were needed. All accounts receivable for all the companies were collected into a central concentration account in Am-

dura's name at Continental. Out of that account funds were distributed to pay expenses by the subsidiaries as needed.

At the time the petitions were filed, there were some $4.7 million in the concentration account. Counsel for the Amdura Committee complains that post-petition some $3 million of those funds were transferred out of this account to ANDCO and Coast without a determination of which entity properly had a claim to those monies. The transfer served to deplete Amdura's cash. Further, during the Chapter 11 proceeding, Amdura has continued to supply administrative support to the subsidiaries without compensation.

Counsel for the Amdura Committee has submitted with its memorandum a partial transcript of the Debtors' testimony at the 341 meeting. The testimony received at that meeting indicates there are significant unresolved questions concerning which entity owned the funds held by Amdura when the petitions were filed. Also unresolved is the status of intercompany accounts among the entities. Thus, it is not necessarily clear which entities are net-debtors and which are net-creditors.

Other inequities may be found to exist which may complicate the resolution of the intercompany interests and impact the reorganization of some or all of these Debtors. For example, if ANDCO has been operating at a profit and Coast at a loss, there will have been a transfer of ANDCO asset values to Coast via the intercompany borrowing. How are such factors to be adjusted in treating fairly the interests of the creditors of each entity and, more to the point, how does counsel fulfill their roles and obligations in advising the Debtors? The potential conflict here is apparent, particularly in light of the fact that it has been represented in the memorandum of law submitted by W & S and F & W that:

> The appointment of new, separate counsel for each Debtor is not mandated because both W & S and F & W represent the Debtors solely in matters in which the Debtors have not even an apparent or potential conflict of interest, and W & S and F & W each has represented to the

Court that it will not represent the Debtors in connection with any such conflict including, but not limited to, intercompany claims. Memorandum at p. 6.

■ Once again it can be observed that the Code mandates a practice which departs from those carried on by the Debtors prepetition and that occurs as soon as the petition is filed. Prepetition, Amdura operated as the benevolent parent of the corporate enterprise taking the proceeds of the accounts receivable of all of the subsidiaries and distributing them among the subsidiaries as the needs arose. But the Code forces the recognition that each debtor is a separate entity with separate assets and separate obligations to creditors. Thus, separate cases had to be filed for each debtor because only a husband and wife can file a joint bankruptcy petition. 11 U.S.C. § 302. These cases are being jointly administered pursuant to B.R. 1015, but joint administration does not create a substantive consolidation of these Debtors. That step can only be effected under circumstances which properly respect the due process rights of all parties. *In re Auto–Train Corp.*, 810 F.2d 270 (D.C.Cir.1987).

As to counsels' role, they once again point to section 327(c) and argue that the Code recognizes that it is permissible for counsel to represent both a creditor and a debtor. But there is nothing that says that counsel may represent a debtor and an account debtor of that debtor. *Roger J. Au & Son, Inc., supra,* 64 B.R. at 605. This problem is then magnified when it is recognized that the account debtor is itself insolvent and unable to pay what it owes.

The court in the *Global Marine* case recognized that representing both a parent and subsidiary corporation in bankruptcy is not *per se* forbidden. *In re Global Marine, Inc., supra.* In doing so that court chose to distinguish between potential conflicts and actual conflicts of interests. In this District *Ginco* tells us that such distinctions are not acceptable.

What counsel would have this Court do is to recognize the realities of the commercial world where one attorney or one firm routinely provides legal representation for an

entire corporate family. Such representation recognizes a unity of interest and purpose and is likely to be more efficient and cost effective. But that is not the circumstance before the Court. Here we have entities which are unable to pay their creditors, perhaps some more so than others. Here we have entities which have sought the protection of this Court and the authority of those entities to operate as a unit is circumscribed by the Code.

█ This Court is not insensitive to the suggestions which have been made that to change counsel at this juncture will be disruptive. However, it would be even more disruptive to have to take the step of disqualifying counsel six months from now in the midst of reorganization negotiations when the "actual" conflict emerges. Nor is this Court insensitive to the possibility of increased administrative costs, but such concerns cannot excuse compliance with the strict letter of the law. *In re Ginco, supra.* If this result is unacceptable to the participants, pleas for change must be directed to Congress and not to this Court which can only decide the law, not write it.

Having considered the totality of the circumstances, this Court must reluctantly conclude that W & S and F & W are indeed not disinterested within the meaning of section 327 of the Code. The Court further concludes that the firms do indeed represent interests which are adverse to the interests of each debtor. The Court further concludes that permitting these firms to represent all of these Debtors under a general retainer, with special counsel for the committees to act in the areas where W & S and F & W cannot, is not a solution which is acceptable in these cases. If nothing else, the role and position of Continental in these cases is too pervasive. Counsel for these Debtors must be able to meet the issues of the Continental loan and its restructuring head on without restraint or concern with other relationships.

The Court's conclusion is unfortunate and is not taken lightly. The Court respects the right of the Debtors to select counsel of their choosing within the limits of section 327 of the Code. The Court

regrets that its conclusion results in the loss from these proceedings of two highly competent law firms. Most assuredly, there is no condemnation of counsel for what they have done and the representation they have provided. The Court must nonetheless honor the mandates of the Code. In doing so, the Court cannot, at this juncture, simply cast the Debtors adrift. There are significant contested matters pending before the Court, and other matters awaiting setting. As corporations these Debtors cannot appear *pro se;* they must have legal counsel and they must have a reasonable period to seek out acceptable counsel to represent them. Thus there must be some transition period. Accordingly, it is

ORDERED, that the orders entered by this Court on April 6, 1990, appointing Winston & Strawn and Fairfield and Woods as counsel to the respective Debtors-in-possession in these jointly administered cases is withdrawn effective July 27, 1990.

ORDER ON MOTION TO CLARIFY ORDER CONCERNING STATUS OF WINSTON & STRAWN AND FAIRFIELD AND WOODS, P.C. AS COUNSEL FOR THE DEBTORS–IN–POSSESSION

On July 6, 1990, this Court entered its Order (the "Order") on the Status of Winston & Strawn ("W & S") and Fairfield and Woods, P.C. ("F & W") as counsel for the Debtors-in-Possession. The Court concluded that the law firms could not be considered to be disinterested and/or that they represented interests adverse to the interests of the estates such that the orders previously entered by the Court appointing them as counsel for the Debtors-in-Possession had to be withdrawn. The law firms have now filed a motion asking that the Court clarify its Order.

The law firms point out, and properly so, that it is time for this Court to enter a procedural order for the payment of the fees of professionals in these cases. It was that issue which initiated the Court's inquiry in the first instance. Accordingly, a separate order will enter to establish an

appropriate procedure for professional fee applications in these cases.

In entering its Order this Court made the withdrawal of the orders of appointment prospective so that the Order would become effective July 27, 1990. As counsel have observed, implicit in the Order was the expectation that the law firms would continue to provide legal services to the Debtors' estates during the transition period. The question that is raised is whether they will be entitled to the payment of legal fees.

Authority does exist which would permit this Court to allow fees for services rendered by W & S and F & W even though the Court has now determined that they failed to meet the qualification standards mandated by Section 327 of the Code. See *In re Roberts*, 75 B.R. 402 (Dist.Utah, 1987). However, the issue of whether these firms should be paid for their services is not, and has not been, before the Court. No parties to these proceedings have had an opportunity to object to the payment of fees or to raise and argue this issue, and the Court will not issue an advisory opinion in the abstract on this question.

Counsel ask clarification of whether this Court has used the terms "Debtors" and "Debtors-in-Possession" synonymously and, if not, whether the Court intended to disqualify W & S and F & W from representing the "Debtors" or any of them after July 27, 1990. The issue that was dealt with by the Court in its Order is the issue that arises under 11 U.S.C. § 327. That section deals with the authorization of the fiduciary in the case to employ professionals. To the extent that the Court referred to the "Debtors" in its Opinion and Order it did so in the entities' roles as fiduciaries, i.e. as Debtors-in-Possession. As the Court observed in its opinion, general ethical standards concerning the employment of professionals are not necessarily the same as the more restrictive standards of Section 327 and, outside of the arena of Section 327 of the Code, the problem of conflicting representation can often be resolved by informed client consent.

Counsel also raise the question of the status of other professionals in this case. Again, this is a matter that was not before the Court in handing down its decision in the July 6 Opinion and Order. The Court observes that pursuant to the provisions of Section 328(c) of the Code, the Court may deny the allowance of compensation for services of a professional person who is "not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed."

■ As to the accounting firm of Deloitte and Touche and the law firm of McGill, Parsonage and Lanphier, there is no suggestion that they are not "disinterested." The concept of "disinterested" as defined under Section 101(13) of the Code is one that focuses on the personal interest of the professional. *In re Kuykendahl Place Associates Ltd.*, 112 B.R. 847 (Bankr.S.D. Tex.1989).

■ As to the question of whether these professionals represent or hold an interest adverse to the interest of the estates, the indication from section 328(c) is that it is the intent in making this evaluation that the Court look to whether the professional is representing an adverse interest "with respect to the matter on which such professional person is employed." Thus, the inference is that the professional may represent clients in a bankruptcy proceeding who are, in fact, adverse so long as the work that is being done by the professional does not concern those competing interests. This is a more expansive view of the Code than was adopted by the Court in the *Ginco* opinion, *In re Ginco*, 105 B.R. 620 (D.Colo.,1988). However, as the Court observed in its Opinion, the holding in *Ginco* has been softened somewhat by the Opinion of Chief Judge Finesilver in the case of *Matter of W.V.S. Investment Joint Venture*, Civil Action No. 89–F–331, 1990 WL 191864 (Dist.Colo., January 4, 1990).

■ The professionals mentioned, i.e., the accounting firm of Deloitte & Touche and the law firm of McGill, Parsonage & Lanphier, would appear to have been en-

gaged to prove services of a decidedly more restrictive scope than that of W & S and F & W. If the Deloitte and McGill firms are not representing interests which are adverse in conjunction with the matters for which they are providing services, the Court perceives no reason why they would be disqualified from providing professional services or in jeopardy for the payment of their fees incurred in connection with such services. However, the Court must caution the professionals that issues concerning the status of any firms other than W & S and F & W are not before the Court and have not been subjected to the scrutiny of the adversarial system.

F & W asks clarification concerning its status in the case. The firm suggests that the Court's Order was based, at least in part, upon an apparent misunderstanding regarding that firm's relationship with the Continental Bank.

A careful review of the memorandum filed by W & S and F & W on June 27, 1990 shows that, in fact, it was not explicitly represented that F & W had disqualified itself from representing these debtors in connection with any claims or demands against the Continental. The Court's misunderstanding on this issue arose as a result of representations made on the record by Mr. Munitz during the course of the hearings on the Debtors' motion to have an examiner appointed. A review of the record at those proceedings indicates that, while the comments of Mr. Munitz were less than precise, the Court certainly perceived the thrust of the presentation to be that an examiner should be appointed to inquire into the Continental loan because neither W & S nor F & W could or would do so. It seemed apparent to the Court that if F & W independently can investigate and diligently pursue claims against the Continental there would have been little need for the filing of the motion for an examiner.

■ The question of whether F & W is "disinterested" within the meaning of section 327 of the Code is really one that only F & W can answer. In the Court's view, the firm's past representation of that bank does not create a conflict within the meaning of 327, or otherwise make F & W not disinterested, unless that law firm, for whatever reason, believes that it would not be able to diligently and zealously represent the debtors on issues concerning the Continental loan. If the Continental is not the "hand that feeds" F & W, and if the firm is not otherwise inhibited, then past representation of the Continental on matters not relating to these debtors would not serve to disqualify F & W from acting as counsel for the fiduciary in these cases.

■ As to W & S, the same analysis must apply. That firm, however, has openly declared its inability or, at least, unwillingness to joust with the bank. It appears to the Court, as concluded in the Order, that issues surrounding the Continental Bank are so pervasive, and the Bank's status as a multimillion-dollar-a-year client of W & S is so significant, that it is difficult, if not impossible, for this Court to reach the conclusion that W & S is "disinterested."

Counsel inquire whether they might be able to represent some one or more of the Debtors-in-Possession as opposed to all. The question arises because of the suggestion that this Court's Order established a *per se* rule against the representation of both a parent and subsidiary debtor. To the contrary, the Court very carefully premised its ruling on a totality of the facts as presented, and declined to adopt a bright line test in this area.

The Court recognizes that each case must be separately examined. Each parent/subsidiary relationship is not the same, and the Court is unwilling to conclude that every case would demand separate counsel. However, the Court is also unwilling to rule prospectively, and in the abstract, that W & S and/or F & W may now properly represent some or any of these entities. The Court suggests that if such an application is filed, it would be appropriate in these cases at this juncture for counsel to give explicit notice of the motion to be employed so that interested parties will have the opportunity to respond. Under the circumstances, the Court would be will-

ing to limit and shorten notice on any such motions.

As to the suggestion that W & S and F & W might "taint" new counsel if they pass on information which they have gathered in representing these debtors, the Court fails to see how the issue arises. It appears to the Court that the question presented is not a 327 issue. In any event, the Court declines to speculate or to issue an advisory opinion.

Having considered the emergency motion to clarify, the Court's Order therefor stands as entered, subject to the limited clarification set forth herein.