**In re AMDURA CORPORATION; Amdura National Distribution Company, fka Fok; Coastamerica Corporation; Coast to Coast Holdings, Inc.; Coast to Coast Stores, Inc.; and Intertrade Cargo, Inc., Debtors.**

Bankruptcy Nos. 90 B 03811 E, 90 B 03812 E, 90 B 03813 D, 90 B 03814 D, 90 B 03815 J and 90 B 03816 E.

United States Bankruptcy Court, D. Colorado.

May 5, 1992.

James L. Nachman, Curt Schultz, Cheryl Tama, Winston & Strawn, Chicago, Ill., for Winston & Strawn.

Leo Weiss, Denver, Colo., for the U.S. Trustee.

Thomas C. Seawell, Ducker, Dewey & Seawell, Denver, Colo., and Mark Schrupp, Sidley & Austin, Chicago, Ill., for The Bank Group.

Steven E. Abelman, Berryhill, Benjamin, Cage & North, Denver, Colo., for the AND-CO Creditors' Committee.

## ORDER ON FINAL FEE APPLICATION OF WINSTON & STRAWN

CHARLES E. MATHESON, Chief Judge.

### I.

### GENERAL

These six related Chapter 11 proceedings were commenced by the filing of petitions in this Court on the 2nd of April, 1990. They were consolidated procedurally for administrative purposes in the case for Amdura Corporation, 90 B 3811 E.

Immediately after the filing of the petitions, an application was filed with the Court on behalf of the six debtors-in-possession ("Debtors") to employ the law firm of Winston & Strawn ("W & S") as counsel pursuant to the provisions of 11 U.S.C. § 327. An affidavit, as required by the provisions of F.R.B.P. 2014, was filed with the Court and an order was entered approving their employment. Pursuant to the Local Rules of this Court, out-of-state counsel must be associated with local counsel. Accordingly, a similar application was filed by the Debtors to employ the Denver firm of Fairfield and Woods ("F & W"), and a similar order authorizing employment was entered.

The two law firms served as counsel from the time of the commencement of the case until July 6, 1990. On that date, this Court entered its Opinion and Order with-

drawing its previous orders authorizing these law firms to serve as counsel for all of the Debtors in these proceedings. *In re Amdura Corp.*, 121 B.R. 862 (Bankr. D.Colo.1990). They were authorized to continue to act on an interim basis pending the entry of appearance of new counsel on behalf of the Debtors. Under that arrangement W & S continued to act as counsel for all of the Debtors through August 10, 1990.

W & S has now filed applications for the allowance and payment of fees pursuant to 11 U.S.C. § 328 and § 330. Hearings were conducted on those applications on December 11, 1991, and a supplemental application was filed thereafter on March 2, 1992, in response to this Court's Order entered following that hearing. This order enters in response to those applications and after consideration of the applications and the evidence submitted both in support and by way of objection to the fee applications.

## II.

### GENERAL STANDARDS FOR ALLOWANCE OF FEES

W & S was hired pursuant to the provisions of 11 U.S.C. § 327 which preconditions employment on being "disinterested" and not holding or representing any interest adverse to the estate. Fees are allowed pursuant to the provisions of section 330 of the Code and that section mandates that the Court may award to a professional person employed under section 327 "reasonable compensation for actual, necessary services rendered by such ... attorney ... based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title...." However, as specified by section 328(c), the Court may deny compensation if, at any time during the professional's employment, he is not a "disinterested person."

In bankruptcy proceedings, issues periodically arise concerning the propriety of charging for certain types of activities such as travel time and other "soft costs," or for the preparation and presentation of fee applications. In part, these issues were resolved in these cases by the Court's general order on professional fees. In addition, this Court has previously expressed its views on these types of issues. *In re Frontier Airlines, Inc.*, 74 B.R. 973 (Bankr.D.Colo.1987); *In re Orthopaedics Technology, Inc.*, 97 B.R. 596 (Bankr. D.Colo.1989). These prior decisions will be applied in the allowance of fees in these cases.

The Tenth Circuit Court of Appeals has established a checklist of factors to be considered in awarding fees. In the case of *In re Permian Anchor Services, Inc.*, 649 F.2d 763 (10th Cir.1981), the Court adopted the standards earlier set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974). In awarding fees in bankruptcy matters, the court should appropriately consider the following factors: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and, (12) awards in similar cases.

The United States Supreme Court has recently revisited the fee arena in the case of *Blanchard v. Bergeron*, 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989). There again, that Court affirmed the principle that in awarding fees a court should start with the "lodestar" reached by multiplying a reasonable hourly rate by the reasonable number of hours required for the task. The Court in the *Blanchard* case relied on its previous opinion in *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The Court in *Hensley* relied on *Johnson v. Georgia Highway Express, Inc., supra*, and recognized that attorneys, in applying for fees, "should make

a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Hensley v. Eckerhart, supra* 103 S.Ct. at 1939–40. The Tenth Circuit Court of Appeals has similarly recognized that the actual time expended by the attorneys is not necessarily the reasonable time required. In the private sector "billing judgment" is an important component in fee setting which is no less important when the fees are to be set by the court. *Ramos v. Lamm*, 713 F.2d 546 (10th Cir.1983).

■ The admonitions of the Supreme Court and the Tenth Circuit are well taken. As this Court has also observed, the setting of fees, whether by the Court or counsel, is an art, not a science. *In re Frontier Airlines, Inc., supra.* This is simply an acknowledgement of the fact that every hour logged by an attorney as "billable" does not necessarily deserve to be billed. Billing judgment must enter into the final analysis.

Unfortunately, in the real world, attorneys do not always meet the Supreme Court's expectation that every lawyer will heed his ethical obligation to exclude excessive, redundant, or otherwise unnecessary time. The reasons for such failure are varied. Sometimes it is simply overt unethical greed on the part of the lawyer. More often, and more charitably, the failure may be laid to human frailty. Lawyers, especially young associates, who are faced with inflexible and excessive quotas of billable hours, are understandably reluctant to exclude time even when they recognize their own inefficiencies and, worse, may be tempted to "puff" when put to the task of writing down the day's efforts. Partners, who face similar performance standards from their peers, are subject to the same pressures to produce "billable" hours. Partners responsible for billing are reluctant to exclude or writeoff "billable" time because of firm pressures to produce billings. And the process is further frustrated by the necessity to make those purely subjective evaluations, called "billing judg-

ments" by the *Ramos* court, *supra*, to determine what time is truly worthy of being billed, and what is not.

■ In applying for fees under 11 U.S.C. § 330, it is the obligation of the attorney to show the entitlement to fees. *Continental Illinois Bank & Trust Company of Chicago v. Charles W. Wooten Ltd. (In re Evangeline Refining Co., Debtor)*, 890 F.2d 1312 (5th Cir.1989); *see also, Hensley v. Eckerhart, supra.* The threshold is, of course, the attorney's time records showing the services rendered and the time expended. Those records must describe the services with sufficient particularity to enable the Court to evaluate the time expended, the nature and need for the service and the reasonable fee to be allowed. *Hensley v. Eckerhart, supra; In re Holub*, 129 B.R. 293 (Bankr. M.D.Fl.1991); *In re Navis Realty, Inc.*, 126 B.R. 137 (Bankr.E.D.N.Y.1991).

■ In bankruptcy cases it is common for the attorney for the debtor-in-possession to be involved in many different matters. In allowing fees, the Court must consider, among other things, the necessity for the particular services, the success achieved and the benefit to the estate. 11 U.S.C. § 330; *In re Permian Anchor Services, Inc., supra.* In order for the Court to make this evaluation it is both necessary and proper that the attorney's billing records be maintained and presented in such a manner that, within reason, the Court can identify the various categories of matters worked on and the time and services allocable to those categories. *Hensley v. Eckerhart, supra; Bee v. Greaves*, 910 F.2d 686 (10th Cir.1990); *In re Vann*, 136 B.R. 863 (D.Colo.1992). The lumping of thousands of dollars of time under one general billing category is inconsistent with this requirement. *In re Vann, Ibid.*

If attorneys meet the state of ethical perfection expected by the Supreme Court, this Court's job, in allowing fees, is easy. It is when the facts and records presented give rise to a suspicion that the applying professional has failed to achieve that perfect state, and has billed time which rea-

sonably should not have been billed, that the Court's task becomes onerous.

 In the final analysis, when it becomes obvious that the attorney has lost that sense of objectivity which enables him or her to subjectively set a reasonable fee, the Court must endeavor to make the evaluation. In doing so, this Court must weigh the hours claimed against its own knowledge, experience and expertise to evaluate the time required to complete similar activities. *Johnson v. Georgia Highway Express, Inc., supra.* Consideration can, and must, be given to the range of factors enunciated in *Permian, supra,* but the ultimate goal is to apply a reasonable hourly rate to a reasonable number of hours which should have been required to achieve the desired results. *Blanchard v. Bergeron, supra.* This is not, never has been, and never can be, a mechanical function, but will always remain a subjective search, not for perfection, not for the right fee, but to determine a *reasonable* fee. That is the standard which must guide this Court in reviewing the fee applications in this case.

## III.

## THE W & S FEE APPLICATION

### A. *Overview of Fees Requested.*

W & S filed its Restated Final Fee Application with the Court on March 2, 1992. It covers the period from April 2, 1990 to May 31, 1991. The firm seeks an aggregate allowance of fees of $873,569.04 and reimbursement of expenses of $111,153.24.

In its fee application W & S has allocated its charges among the various debtors, where possible, and among various billing categories, as appropriate. A similar allocation was made of the disbursements for which reimbursement is sought. A table setting forth the allocation by W & S of the fees and disbursements is attached to this Order as Exhibit A, and a table setting forth the allocation by W & S of payments received is attached to this Order as Exhibit B.

### B. *Objections.*

Objections have been filed to the W & S fee applications by the Creditors' Committees in the three principal cases, those being Amdura Corporation ("Amdura"), Amdura National Distribution Company ("ANDCO") and Coast to Coast Stores, Inc. ("Coast"). An extensive objection has also been filed by the Continental Bank, N.A. (the "Continental"), as agent for the various lenders comprising the Bank Group ("the Bank Group"). Initially, the Bank Group had filed a generalized objection to the W & S fee application. Subsequently, on October 31, 1991, in response to this Court's order concerning hearings on the fee applications, a more detailed objection was filed. The Bank Group asks that the fee allowance to W & S be reduced by an aggregate of $194,987.00 and that the disbursements be reduced by $16,891.00. The fee disallowance urged by the Bank Group consists of $10,385.00 for excessive intra-firm conferencing, $9,482.00 for inadequate time descriptions, $46,371.00 for inadequate allocation among several tasks (i.e., "lumping" of time entries), $953.00 for excessive staffing of inter-firm meeting, $24,933.00 for travel time, $603.00 for project overstaffing, $10,366.00 for excessive time on a particular matter or issue, and $91,894.00 for services which produced no demonstrable benefit to the estate. As to disbursements, the Bank Group urges the disallowances of $7,087.00 for improper overhead expenses and $9,804.00 for excessive charges in light of the description provided.

In support of its position, the Bank Group set forth in its objection a table specifying the precise time entries to which the Bank Group objected, the basis for the objection and the amount of charge to which the objection is made. The detailed objection is organized on a calendar basis identifying the date, the attorney and the general matter as to which the objection is made. The Court has found the objection to be meaningful and useful in evaluating the kinds of entries to which objections have been lodged and the Court has carefully considered the objections made by the Bank Group in evaluating the W & S fee applications.

## IV.

## ANALYSIS AND ALLOWANCE OF FEES AND EXPENSES

### A. *Evidence Presented.*

■ The fee application filed by W & S sets forth in significant detail the various kinds of matters for which services were provided to these Debtors. In addition, W & S submitted copies of the firm's billing statements comprised of the daily time entries maintained by the attorneys, a description of the services provided and the amount of time spent in providing the services. The Court also received the testimony of Mr. James L. Nachman, Esq. and Ms. Cheryl Tama, Esq. for the firm of W & S, and certain exhibits which were primarily demonstrative.

The evidence reflects that, overall, these were rather large and complex reorganization proceedings. The filing of the Chapter 11 cases was precipitated when the Debtors were unsuccessful in renegotiating their outstanding bank loans with the Bank Group.

As is typical in all Chapter 11 proceedings, the filing of the petition occasioned the need for legal services on an expedited basis concerning a wide variety of matters. Hearings on the use of cash collateral consumed a significant amount of time in the first month. The mere filing of the cases had, a dislocating effect on the Debtors' workforce which required counsels' attention. Amdura, by reason of the historical operations of its predecessors, had to contend with a variety of environmental problems. Amdura, in particular, but all of the Debtors together, faced the uncertainty of claims being asserted by the Pension Benefit Guaranty Corporation. Difficulties were also encountered by reason of claims by the Union under 11 U.S.C. § 1114. Day to day operations were disrupted because, historically, Amdura, the parent, had provided the basic management services for all of its subsidiaries and had controlled all of the cash through a collection account under its control. The filing of the reorganization proceedings necessitated attention to the way in which those management services were provided and created problems which had to be solved to provide funding for Amdura itself. Efforts were also made by the Debtors, Coast and ANDCO, to sell their assets and significant services were provided by W & S in connection with all these activities. There were many additional services provided on a wide variety of other matters in these cases, all of which were summarized in detail in the fee application filed by the firm.

With so many matters being handled in such a relatively short period of time, and two law firms being involved, both the creditors and the Court have had concerns about the duplication of services. To be sure, some duplication is required by the Local Rules of this Court which mandate that W & S associate with local counsel who must be "meaningfully involved" in the case. This Court is certainly cognizant of this factor and has recognized it in the past. *See, In re Frontier Airlines, Inc., supra.*

Mr. Nachman testified that he was responsible for delegating work among the attorneys at W & S and endeavored to eliminate the duplication of services whenever possible. He also testified that efforts were made between the two firms to avoid, to the maximum extent possible, the duplication of legal services between them.

This Court has also heard and considered the parallel fee applications in these cases filed by F & W. In connection with the hearings on the F & W application, the Court also heard the testimony of Mr. Wayne Waldera, the President and/or CEO of the Debtors, concerning the allocation of work between W & S and F & W.

This Court is satisfied from the evidence presented that there was not an unwarranted duplication of services between the two firms. Certainly, there was frequent communication and many telephone calls and meetings. But it is also clear that each firm was responsible for handling discrete, albeit related, matters. Some duplication is unavoidable if local counsel is to be "meaningfully involved" in the case, as mandated by this Court's own rules. The Court is satisfied that the extent of duplicative ser-

vices was minimized and that there should be no general reduction in fees on this account.

### B. General Presentation of the Fee Application.

Early on in these proceedings, the Court expressed the desire to have in place an order to provide for the orderly and timely payment of fees for the professionals. At the request of the Court, counsel drafted and presented a proposed order to the Court which, after notice and hearing, the Court approved and entered on July 31, 1990, (the "Fee Order").

Because of the number of common issues among the Debtors, there were many occasions when counsel for the Debtors provided services which were clearly beneficial to two or more Debtors and occasions when it was apparent that counsel could not determine to which single estate the services pertained.

Recognizing this problem, the Fee Order contained an explicit procedure to deal with the allocation of billings among the Debtors. That provision stated:

G. Fees and expenses of professionals retained by the Debtors shall be billed by such professionals, as applicable and practicable, to the extent possible, separately to the Estate benefitting from such service and shall be paid by such Estate ("Allocated Fees and Expenses"). To the extent fees and expenses are not capable of allocation by a professional to individual Estates, such fees and expenses shall be paid by all Estates on a proportionate basis as follows: The Debtors shall, on a monthly basis, calculate the total of Allocated Fees to be paid by each Estate and the percentage that Allocated Fees paid by each Estate bears to the total Allocated Fees incurred by professionals retained by the Debtors. Each Estate shall be responsible for the payment of the same percentage of fees and expenses that are incapable of allocation. By way of example, assume that, in a given month, a total of $100,000 in fees have been billed by Debtors' professionals, $48,000 to Coast to Coast Stores, Inc., $42,000 to AMDURA National Distribution Company, and $10,000 to AMDURA Corporation. In that month, Coast to Coast Stores, Inc. shall pay 48% of the fees incapable of allocation, AMDURA National 42%, and AMDURA, 10%. The percentages of unallocated fees that each Estate pays shall vary from month to month, with the monthly variation in the allocation of Allocated Fees to each Estate.

W & S filed its original application for final fees in November 1990. The Court thereafter determined that W & S had not properly complied with the Fee Order in allocating its time for its services and its out-of-pocket charges among the various Debtors. W & S was requested to file an amended final application in compliance with the Fee Order, and it is that application which is presently before the Court.

The fee application submitted by W & S evidences that efforts were made by the firm to establish a billing system which would enable the attorneys to identify with some degree of particularity the Debtor for whom services were being provided and the particular matter being worked on. Thus, there are some seventeen separate billing categories which were used, as reflected in Exhibit A attached hereto.

In certain circumstances services were provided by W & S which, the firm believed, benefitted more than one, but not all, of the Debtors. In those instances, the firm attempted to allocate, on a pro rata basis, the time and charges involved to those Debtors which were so benefitted. That time allocation is explicitly disclosed with respect to the particular time entry in the revised fee application filed with the Court.

The objection filed by the Bank Group raises a variety of issues directed to the format and presentation of the fee application. In particular, the Bank Group argues that, in certain instances, the billing entries lump time together for a variety of different services or contain an inadequate description of the services rendered.

It is, of course, the obligation of the professional to provide an adequate fee application and adequate information from which the Court and the creditors may determine the reasonableness of the fees requested. *In re Orthopaedics Technology, Inc., supra; In re Vann, supra.* A failure to provide such information may result in the denial of fees for the services. On the other hand, this Court has also had occasion to decry the need for slavish detail in the presentation of fee applications. *See, In re Frontier Airlines, Inc., supra.*

As the Court has already observed, there were many services provided in this case in a relatively short time period. The client required attention to multiple tasks, most of which also involved serious time pressures. Many hours were billed by the professionals. It is reasonable under any circumstances to expect that, out of the totality of hours billed, there may be some percentage of entries which contain less information than is optimally desirable. The Court ought to consider such objections in the totality of the circumstances when evaluating whether the fees and charges overall were reasonable and necessary. This evaluation will be more fully discussed and addressed below.

### C. *Impact of July 6, 1990 Order.*

As noted at the outset of this opinion, when these six reorganization proceedings were filed, an application was filed by W & S to be employed as counsel for each of the Debtors. In support of that application, W & S filed its affidavit as required by F.R.B.P. 2014. That affidavit disclosed the interrelationship among the Debtors and the existence of various intercompany claims. The affidavit also disclosed that W & S had, from time to time in the past, acted as counsel for the Continental, but had never represented the Continental in connection with any loans involving Amdura. No further disclosures were made in the affidavit concerning the relationship. In particular, W & S did not disclose that having the Continental as a client in other matters would in any way limit or restrict the ability of W & S to represent the Debtors in these proceedings.

On April 17, 1990, a motion was filed in these proceedings for the appointment of an examiner. Notice of the filing of that motion was given pursuant to Local Rule 23 of this Court. Any party objecting to the motion was required to file such objection by May 7, 1990, failing which an order would have entered, assuming the application was otherwise acceptable. Objections, however, were filed and, on May 11, 1990, the Court set the matter for hearing on June 15, 1990.

During the same time span, the fee allocation problem had arisen and the Court had encouraged the professionals to consider the presentation of a procedure order for the payment of professional fees and the filing of fee applications. On May 4, 1990, a motion was filed with the Court to establish such a fee procedure and, again, notice was given pursuant to Local Rule 23. Objections were filed to that application as well and the Court set that matter down for a hearing on June 15 at the same time as the hearing on the examiner motion.

When the examiner motion came on for hearing before the Court, the argument in favor of the motion was presented by Gerald Munitz of W & S. He presented essentially two reasons for the appointment of an examiner in these cases. He argued that, shortly before the filing of the bankruptcy cases, there had been a change in management. He stated that it was the view of new management that it would be preferable for an outsider to investigate and determine whether prior management was guilty in any respect of mismanagement of the business. Thus, it was argued, an examiner ought to be appointed to conduct this examination.

The second argument in favor of the appointment of an examiner focused on the relationship between W & S and the Continental. In the hearings on the motion to appoint an examiner, Mr. Munitz disclosed, for the first time to this Court, that the relationship between W & S and the Continental was so significant that W & S had

disqualified itself from initiating any proceedings to challenge the claims of Continental or the Bank Group as against the Debtors and their assets. Mr. Munitz implied at that time that such a taint also applied to its co-counsel, F & W. He argued that it was imperative that an investigation be made into the validity and efficacy of the loans of the Bank Group and that an examiner ought to be appointed to conduct such an examination because neither W & S nor F & W could do so.

At the same hearing, the Court took up the question of the proposed Fee Order for the payment of professional fees. Paragraph G, cited above, dealt with the problem of how time would be allocated among the Debtors. The Court was concerned about its obligation to award fees with respect to each individual Debtor's estate under these circumstances. The Court's concerns, however, went beyond the technical problem of prescribing the format for fee applications. They also extended to the substantive question of whether it was proper for counsel to represent all of the Debtors. The Court's concerns were magnified by the disclosures made by Mr. Munitz about the relationship between W & S and the Continental.

In order to give the law firms the opportunity to adequately respond to the Court's concerns, the Court set the matter over for further hearings on June 27, 1990, both as to the adoption of the Fee Order and to also reconsider the Court's orders appointing W & S and F & W as counsel to the Debtors. On June 27th, the Court heard the arguments of the parties, received the briefs that had been filed and took the matter under advisement. Thereafter, on July 6, 1990, the Court entered its order wherein it determined that the orders previously entered authorizing the Debtors to employ W & S and F & W as counsel had to be withdrawn. *See, In re Amdura Corp.*, 121 B.R. 862 (Bankr.D.Colo.1990). The Court's opinion focused on two issues. One issue, identified by the Court as being the "most significant factor," concerned the role of the Continental and its relationship to the Debtors, to W & S and to F & W. *Ibid* at 866. The second issue concerned the propriety of having one attorney representing all of the Debtors in this case in light of both the significant intercompany debts that existed and the multitude of prepetition transactions that had taken place among these Debtors. The Court concluded, in light of the totality of the circumstances, that an order should enter disqualifying both firms from acting as counsel to the Debtors in these cases.

Following the entry of the July 6, 1990 Order, the law firms filed a motion to clarify. The Court again reviewed the transcripts of the prior hearings and considered the arguments set forth in the motion to clarify. In its ruling, the Court explicitly recognized that the fact that W & S and F & W represented the Continental in other matters did not *per se* disqualify them from representing the Debtors. *Ibid*, 121 B.R. at 870–71; *see also, In re Dynamark, Ltd.*, 137 B.R. 380 (Bankr.S.D.Cal.1991). The focus had to be on the nature of the relationship and whether the relationship would inhibit, in any way, the zeal of the attorney in contesting positions taken in the case by counsel's erstwhile and valued bank client.

After reviewing the evidence presented this Court concluded that F & W did not represent a conflicting interest and was "disinterested"

> unless that law firm, for whatever reason, believes that it would not be able to diligently and zealously represent the Debtors on issues concerning the Continental loan. If the Continental is not the "hand that feeds F & W", and if the firm is not otherwise inhibited, then past representation of the Continental on matters not relating to these Debtors would not serve to disqualify F & W from acting as counsel for the fiduciary in these cases. *In re Amdura Corp., supra*, 121 B.R. at 871.

The status of W & S appeared to be to the contrary. The Court stated:

> As to W & S, the same analysis must apply. That firm, however, has openly declared its inability or, at least, unwillingness to joust with the Bank. It ap-

pears to the Court, as concluded in the Order, that issues surrounding the Continental Bank are so pervasive, and the Bank's status as a multimillion-dollar-a-year client of W & S is so significant, that it is difficult, if not impossible, for this Court to reach the conclusion that W & S is "disinterested." *Ibid.*

At the hearing on the W & S fee application, Mr. Nachman testified concerning the active and aggressive role taken by the Continental, as agent for the Bank Group, in these cases. He testified that the Bank Group and the Debtors had "substantially different points of view as to what should be done" (Transcript, p. 9), with the Banks pushing for immediate and total liquidation and the Debtors seeking reorganization (Transcript, p. 39). He testified that the case was one of the most contentious he had ever encountered (Transcript, p. 52), and that the aggressive position of the Banks contributed to the substantial billings by W & S in areas such as the Debtors' use of cash collateral and the sale of assets in which the Banks had an interest (Transcript pp. 41, 52). In short, Mr. Nachman confirmed that the interests and claims of the Continental in these proceedings were all pervasive.

Under cross-examination by counsel for the Continental, Mr. Nachman testified concerning the reason for the motion for the appointment of the examiner. That testimony was as follows:

A The motion for appointment of an examiner contained—this is just a paraphrase—the request that the examiner investigate the matter of the Bank Group's asserted liens and the related claims against the three active estates.

Q And would it be fair to say that the reason for that was that Winston and Strawn was not in a position to represent the debtors in doing that kind of an investigation?

A That was not the primary thrust of that, although it was certainly a consideration.

Q What was the primary thrust?

A The primary thrust was that there appeared to the debtors to be a need for a person who was neutral in every sense of the word to make an investigation of those matters which we hoped would put to rest for once and for all the cloud that really hung over the proceedings by the uncertainty as to whether and to what extent the Bank Group as a collective creditor really controlled the cases.

Q Well, you're not telling us that you didn't even look at that question before the filing of a petition, are you?

A We were certainly aware of the issue.

Q You had reviewed the loan documents between the parties, I would assume?

A No.

Q You never reviewed the loan documents, never before the filing of this petition?

A No, I did not.

Q No, did anybody at Winston?

A Not to my knowledge.

. . . .

Q (by Mr. Seawell) The question very simply, Mr. Nachman is had your firm read the loan documents that commemorate the loans between the debtors and the banks?

A Not to my knowledge.

Q Do you find it unusual to be negotiating cash collateral agreements without having read the loan documents?

A We didn't expect to be in a position of asking for the use of cash collateral when we did; those matters were very greatly accelerated.

Q But on April 4th, you did find yourself in that position, and clear through April and May you find yourself in that position. Did you ever read those loan documents?

A No, I did not.

Q Did anybody at Winston?

A Not to my knowledge. We had then pending before the Court the motion for the appointment of an examiner for that exact purpose.

Q So you hoped that the examiner would review the documents and tell the

debtors what claims and rights they may have with respect to the banks?

A That was one of the certainly the primary duties we hope would be assumed by the examiner, yes. (Transcript, p. 132, ln. 4—p. 134, ln. 15).

He was then questioned concerning the relationship between W & S and the Continental and how it affected the ability of W & S to represent the Debtors. He was also questioned concerning the disclosures made by W & S to the Debtors concerning the relationship and its effect. That testimony, in pertinent part, was:

A Continental Bank, the agent, as you know is a and was a client of Winston and Strawn and it was a, in our view, an unethical position to be in to be suing or investigating for the purpose of ultimately suing a client of the firm. (Transcript, p. 134, ln. 23—p. 135, ln. 1).

Q But by the time that you sought the appointment of the receiver [sic, examiner], by that time at least, which was shortly after the filing date, you had concluded that somebody ought to look at these loan documents and figure out what the rights of the debtors were with respect to the banks; is that right?

A We knew that these cases would require a determination of the validity and the priority and extent of the Bank Group's asserted liens and claims.

Q Okay. And that's what you wanted the examiner for?

A Yes. (Transcript, p. 135, ln. 20—p. 136, ln. 4).

. . . .

Q ... Now, at the time you first discussed representation with these debtors, did you discuss with them the conflict with Continental Bank?

A We discussed our relationship with Continental Bank, yes.

Q And up to the time that you—

THE COURT: May I inquire when this was, Mr. Nachman? When did you first discuss the representation and have occasion to discuss with Mr. Waldera or others your relationship with the Continental Bank?

THE WITNESS: Your Honor, when I personally became involved in these matters, the issue had already been raised, and that was in mid or late February of 1990.

THE COURT: All right. Thank you.

Q (by Mr. Seawell) Do you know when it was first raised with the debtors?

A Not other than that it was prior to my personally joining this engagement.

Q Do you know when the debtors and Winston first started talking about Winston's representing them in connection with their insolvency problems?

A My recollection is that it was either very early January, 1990, possibly late December, 1989. (Transcript, p. 136, ln. 11—p. 137, ln. 7).

. . . .

Q And do you know what was said to the debtors?

A I know with specificity because of a letter that memorialized the relationship between Winston and Continental Bank.

Q Between Winston and Continental Bank?

A Yes. That is to say that Winston—it was just confirming that Continental Bank was a client of Winston and Strawn.

Q Okay. Is this a letter written to the debtors?

A This was a letter that was written to the chairman of the board of Amdura Corporation.

Q Okay. And it describes the Winston relationship with Continental Bank; is that what you're saying? (Transcript, p. 137, ln. 17—p. 138, ln. 3).

• • • • •

Q Okay. Well, let me ask you. Either in that letter or in any other fashion, did Winston and Strawn advise these debtors of the risk of representation of the debtors in light of their relationship with Continental Bank?

A I don't know. Forgive me; what do you mean by risk?

Q Well, that you might get disqualified somewhere down the line.

A I don't remember mention being made of disqualification.

Q Were there any risks discussed, any risks to the debtor that you advised them of?

A Not that I recall. (Transcript, p. 138, ln. 14—p. 138, ln. 24).

. . . . .

Q So the risk that you would—well, the risk was known to them that you might not be able to pursue litigation with Continental Bank; is that what you're saying?

A Are you referring to—when you say you, are you referring to Winston?

Q Yes.

A Yes.

Q And when was that risk pointed out to them?

A Prior to my involvement.

Q All right. And do you know what—how that risk was characterized? I mean, that's sort of like saying—I mean, that was a big risk, wasn't it? I mean, Continental Bank was clearly, as head of the Bank Group, going to be the dominant player on the creditors side, wasn't it?

A Forgive me. Again, I'm not sure what you mean by risk.

Q The risk being that you could not represent the debtors in any capacity that involved Continental Bank. Is that—would you say that's the risk that they were aware of?

A No. (Transcript, p. 139, ln. 17—p. 140, ln. 10).

. . . . .

Q (By Mr. Seawell) Okay, let me not try to put the words, you tell me what were the risks that you identified to the debtors resulting from your representation of Continental Bank?

A I would not use the word risk.

Q Problems.

A I would not use the word problem.

Q Limitations on your ability to represent the debtors?

A That we would not sue Continental Bank.

Q It's that simple?

A I'm sure that's an over simplification, but—

Q All right. Well, that's a good—let's start with that, that you would not—you could not sue Continental Bank.

A That we would not.

Q Would not. Okay. What about defending claims filed by the bank?

A I am not aware of any subcategories, if you will, of the extent of limitation, if any, to use your word.

Q What do you mean by that? I'm sorry, now I'm not following you.

A I'm not aware personally of any communication, discussion of what we would do or what we would not do other than with respect to litigation, a lawsuit against the bank or the Bank Group. (Transcript, p. 141, ln. 13—p. 142, ln. 11).

. . . . .

Q Okay. Mr. Nachman, let's come back now and look at some of these things on a—one at a time and from a different perspective.

In light of what you've told us about your firm's position in representing the debtors in matters adverse to Continental Bank, how did you justify representing the debtors in the cash collateral disputes?

A I can't tell you where a line might be drawn, but at least I personally and our firm saw a distinction between taking a position with respect to cash collateral and engaging in what I'm calling litigation, a lawsuit with the Bank Group or Continental Bank testing, for example, a lien or a claim.

Q Can you tell us what that distinction is? I mean, you had economic interests on both sides that are absolutely in conflict, don't you, whether it's in a cash collateral context or a lien set aside context?

A I can only say I don't know where a line might be drawn, but at least in my own opinion as a matter of my own professional judgment, we had not crossed the line, at least with respect to the issue of cash collateral, to the extent that that

was negotiated or disputed in these cases.

Q Okay. You talked in your direct examination of the fact that the Bank Group filed an objection to the Coast sale. Did you see that as a conflict between the Bank Group and Coast?

A Well, it was denominated a response. The Bank Group said that unless certain conditions were met, they wouldn't support the sale, our advice to the client, the estate, was to not accede to the Bank Group's demands. (Transcript, p. 145, ln. 19—p. 146, ln. 21).

. . . . .

Q (by Mr. Seawell) So the question I think, Mr. Nachman, was how did you justify representing Coast in light of the response/objection filed by the Bank Group with respect to the Coast sale?

A I can only repeat, Mr. Seawell, that at least in my professional judgment and that of our firm, that we had not crossed that line that you and I have each referred to a few moments ago that would take us into the area of litigation. We advised our client not to accede to the demands of the Bank Group. (Transcript, p. 147, ln. 15—ln. 24).

The evidence establishes that W & S was strongly committed to its client, the Continental, which Mr. Munitz referred to as being "the hand that feeds" W & S. Because of that relationship Mr. Nachman believed that it would have been unethical for W & S to mount a direct challenge to the validity or priority of the Banks' loans and security. Beyond that he was unable to specify where the line might be drawn.

 The problem with the position of W & S is that it was not disclosed to the Court or other interested parties when W & S sought to be appointed as counsel herein. All the 2014 affidavit contained was the benign representation that W & S had acted as counsel to the Continental in other matters. There is not even any evidence to establish that W & S had advised these Debtors that the firm's inability, or unwillingness, to challenge the Banks' loans on a direct basis might affect how the firm handled other matters in these proceedings where the Banks' financial interests were potentially being adversely affected. These disclosures did not come before the Court until the hearings on the motion to appoint an examiner—an examiner whose primary purpose was to undertake an investigation of the Banks' loans because of the refusal of W & S to do so.

W & S represents, by the testimony of Mr. Nachman, that it had not crossed that imaginary, self-imposed line of impropriety. Perhaps that is so, but no one will ever know. It is impossible, after the fact, to make this kind of determination. Thus, we will never know whether the subtle pressure exerted by the fear of offending such a significant client may have colored the tactical decisions made by W & S, as counsel for these Debtors, when the interests of the Continental were at risk.

Without question, W & S repeatedly represented these Debtors in opposition to the financial interests of the Bank Group, and those hearings were often heated. However, would the representation of the Debtors have been more effective if counsel had been under no self-imposed restraint?

The dangers in this area are evident. For example, in most cases the cash collateral hearing serves to focus on the question of the extent and validity of the lender's claimed security interests. The debtor's position, and bargaining status, are enhanced if there is even a hint of lender impropriety or, perhaps, neglect in adequately and fully perfecting its security interests. Here the Court had numerous hearings, and W & S expended some $93,000.00 in billable time, on cash collateral hearings, yet W & S had never examined the Banks' loan documents. All of that was to be left to the examiner so that W & S would not offend "the hand that feeds."

In the *Dynamark* case, *supra*, the court defines a "disinterested professional" as one "that can make unbiased decisions, free from personal interest, in any matter pertaining to the debtor's estate." W & S clearly failed to meet this test, at least as to any controversy potentially touching the Continental.

W & S has sought to minimize its problem in this area by suggesting that F & W, which had no similar reservations, could have represented the Bank Group in pursuing "litigation or opposition to the Bank Group...." That, indeed, was possible.[1] The problem is that it was not implemented. W & S was the firm which undertook to represent the Debtors in opposition to the interests of the Banks, and did so without disclosing its conflicting loyalties.

The obligation fell on W & S to make the disclosures required by F.R.B.P. 2014. *In re Sixth Avenue Car Care Center, Inc.*, 81 B.R. 628 (Bankr.D.Colo.1988); *In re Coastal Equities, Inc.*, 39 B.R. 304 (Bankr. S.D.Cal.1984). In this District the obligation to fully disclose conflicts was aptly described by former Chief District Judge Winner when he stated:

> An attorney is not automatically precluded from representing a party merely because he has formerly represented others who are parties to the current transaction. However, an attorney owes a fiduciary duty to the client by whom he is retained to exercise his independent professional judgment on behalf of that client ... This includes the duty to disclose any conflicts of interest that may arise from his representation of other parties. Actually, the duty goes further than simple disclosure. Given that the duty is upon the attorney to "divulge conflicts, and not upon the client to ferret them out", the attorney should not only inform the parties of the former representations, *but should evaluate for himself, as well as for his client, any potential for any impropriety that might arise* ... Only such reflection on the part of the attorney could lead to the "full and fair disclosure" required. Thus, the general rule that a lawyer may represent clients with potentially conflicting interests with the consent of the clients is qualified in that it must be "obvious" that he can adequately do so. (citation omitted; emphasis added). *Matter of King Resources Co.*, 20 B.R. 191, 200–01 (D.Colo.1982).

That obligation of full disclosure was simply not met by W & S in this case. To the contrary. Here, the firm disclosed its relationship with the Continental, but did not disclose that the relationship would in any way limit the scope of the firm's representation of the Debtors. Thus, the tacit representation to the Court and the creditors was that the firm's relationship to the Continental did *not* in any way inhibit the firm's representation of the Debtors. It is now clear that this was not the case.

This Court has previously disallowed fees when it has found that the attorney for the fiduciary has not been candid in making full disclosure to the Court concerning potential conflicts of interest or other interests which might have barred representation under 11 U.S.C. § 327. *In re Sixth Avenue Car Care Center, Inc., supra; In re Flying E Ranch Co.*, 81 B.R. 633 (Bankr.D.Colo.1988). It is not a view unique to this Court. *In re Western Office Partners, Inc.*, 105 B.R. 631 (D.Colo.1989); *In re Neidig Corp.*, 113 B.R. 696 (D.Colo. 1990); *In re B.E.S. Concrete Products, Inc.*, 93 B.R. 228 (Bankr.E.D.Cal.1988); *In re Kendavis Industries International, Inc.*, 91 B.R. 742 (Bankr.N.D.Tex.1988); *In re Diamond Mortgage Corp. of Illinois*, 135 B.R. 78 (Bankr.N.D.Ill.1990); *In re Vann, supra; In re EWC, Inc.*, 138 B.R. 276 (Bankr.W.D.Okl.1992). Indeed, the Code itself specifies that such a remedy may be appropriate. 11 U.S.C. § 328(c).

█ The disallowance of fees is not mandated by section 328(a), which is permissive in tone. And, courts have recognized that such a sanction is not always required. *In re Roberts*, 75 B.R. 402, 412 (D.Utah 1987) (Where the equities outweigh the need for attorney discipline for failure to disclose conflicts, the law does not require the denial of fees.); but see, *contra, In re EWC, Inc., supra.* The court in the *Diamond Mortgage* case, *supra*, set forth a four part test to be used in evaluating whether to sanction an attorney for "potential" conflicts, which was:

---

**1.** Of course, this should have obviated any need for the appointment of an examiner.

1. Whether "the likelihood of public suspicion or obloquy outweighs the social interest which will be served by a lawyer's continued participation in a particular case";

2. The foreseeability or likelihood that the potential conflict will become an actual conflict;

3. The availability of other competent counsel; and

4. The specific circumstances surrounding the case which make the attorney's, representation inappropriate. *In re Diamond Mortgage Corp., supra,* 135 B.R. at 92 (citations omitted).

This Court has already determined that the interests of the Bank Group in this case were so pervasive and important that it would be inappropriate for W & S to continue to serve as counsel for the debtors-in-possession. *In re Amdura Corp., supra.* The appeal of that order was withdrawn, and that order is the law of this case. The Court is satisfied that the order was appropriate under the circumstances of this case.

 The Court is also satisfied that further monetary sanctions are appropriate by way of the denial of fees for legal services on matters where W & S purported to represent the interests of the Debtors in direct contravention to the interests of the Bank Group. This conclusion is mandated because of what this Court considers to be the egregious failure of W & S to candidly disclose at the outset that it would be unable to represent these Debtors in any action which called into question the validity or priority of the Bank Group's Loans.

The most obvious area where the potential for the conflict was present is the work done by W & S in connection with the Debtors' motions to use cash collateral. As has already been observed, in representing the Debtors in this area, W & S did not even review the loan documents or seek to assure itself that the Banks' security interests had been validly perfected or were not otherwise subject to attack under the provisions of the Code. It had not even done so prepetition, even though W & S had been representing Amdura for several months in negotiating with thg Bank Group in an effort to avoid bankruptcy. The conflict here was not just "potential"; it was real. There were significant financial interests at stake on both sides, and the Debtors, the creditors, and this Court were entitled to presume that the representation of the Debtors' interests by W & S was undertaken without restraint or condition of any kind. Such was not the case. Accordingly, it is appropriate that W & S be denied fees for its services in this regard. Charges for those services total, from the firm's billing statements, $93,098.75.

Another area that brought the interests of the Debtors and the Bank Group into sharp contest was the effort by the Debtors to sell assets. W & S has billed, in the aggregate, $245,749.00 for its services in this area. It is impossible to determine from the time records which of the various services involved questions where the interests of the Bank Group were potentially at risk. Just considering the time which is reported for those entries which make direct reference to the Bank Group, to objections filed by the Bank Group to the sales, and to contests concerning the allocation of proceeds, the records show billings of $100.00 to Amdura (by Ms. Tama on 5/8/90, which involved a review of the Bank Agreement to verify the Banks' collateral); $2,657.00 to ANDCO; and $33,179.00 to Coast. These billings also should not be allowed.

 The Bank Group argues that W & S should also be denied fees for its services in seeking to be continued as counsel herein, including the services in connection with the (ultimately withdrawn) appeal of this Court's July 6 Order. Fees for services on these matters were recorded in two billing categories maintained by W & S, one denominated "Retention/Payment of Professionals" ($41,522.25 in aggregate billings), and one denominated "July 6 Order—Appeal" ($68,138.00 in total billings.) An examination of the entries shows that of the total time billed in the "Retention/Payment of Professionals" category, $5,655.00 of "unallocated" time was, in fact, time related to the preparation and filing of fee applications and does not relate to the dis-

qualification issue. Thus, the total billings for these services was $104,005.00.

This Court has previously considered a similar objection in connection with the final fee application filed herein by F & W. That firm billed some $21,000.00 for services in this area to which the Bank Group objected. The Court did not agree with the position of the Bank Group and allowed the fees as requested. It did so in recognition of the fact that there were two significant issues considered by the Court in its July 6 Order. One, referred to as the "most significant", concerned the disqualification of W & S because of its undisclosed allegiance to the Continental. The second concerned the propriety of one attorney serving as counsel to all of these interrelated debtor entities. *In re Amdura Corp., supra.*

The problems posed in this second area in cases such as this, where there are several related entities in reorganization, was recognized by the Court to be an evolving area of the law. The views of the Court in this area were not without precedent, as was set forth in the opinion. *In re Amdura Corp., supra.* If those views, as stated in *Amdura*, were unique, they certainly are becoming more common. *See, In re Professional Development Corp.,* 129 B.R. 522 (Bankr.W.D.Tenn.1991); *In re Green Street,* 132 B.R. 460 (Bankr.D.Utah 1991); *In re BH and P, Inc.,* 949 F.2d 1300 (3rd Cir.1991); *In re TMA Associates, Ltd.,* 129 B.R. 643 (Bankr.D.Colo.1991); *In re EWC, Inc., supra.* The Court recognized the importance of this issue being presented and, if possible, preserved on appeal. For this reason, and because the Court found that F & W was not otherwise disqualified from representing these Debtors, the Court allowed the fees of F & W which pertain to this issue.

W & S does not stand in the same position as F & W. Regardless of the multi-debtor issue, W & S was found to be disqualified to continue to represent these Debtors because of the firm's inability and unwillingness to confront, without reservation, the Bank Group in this reorganization proceeding. *In re Amdura, supra,* 121 B.R. at 871. Thus, there was no purpose to

be served for W & S to continue to press the multi-debtor representation issue.

The services provided by W & S in this area were not only of no benefit to the estate, the efforts by W & S to maintain itself as counsel in this case were detrimental to the interests of all others. The disqualification of lead counsel three months into a large reorganization case is not something to be lightly undertaken. It is disruptive and, most assuredly, expensive because of the inevitable time it takes for new counsel to appear and get up to speed in the case. That unfortunate state of affairs did not arise out of any uncertainties concerning multi-debtor representation. That unfortunate state of affairs arose out of the failure of W & S to candidly disclose the firm's mixed loyalties in this case. The Court cannot condone this action, and is loathe to award the attorneys for their time in attempting to continue their representation in this case. Accordingly, the Court will deny fees to W & S in the amount of $104,005.00 for such services.

■ In its opinion in the case of *In re EWC, Inc., supra,* the court makes a persuasive case for the adoption of a bright line rule, denying all fees to counsel when it appears, after appointment, that the attorney was, in fact, not disinterested or was representing a conflicting interest. This Court has been reluctant to adhere to such a restrictive view. In this case, there is no question that W & S provided legal services of significant benefit to these Debtors in areas not involving the separate economic interests of the Bank Group, and the Court does not believe that the public needs, the sanctity of the bankruptcy system nor the express provisions of 11 U.S.C. § 328(c) demands the imposition of sanctions beyond those imposed by this order.

### D. *Transition Time.*

■ The Court's July 6, 1990 Order mandated a change in counsel for the Debtors in the midstream of these cases. Of necessity, services were provided by W & S in effecting an orderly transition of the pending legal work to incoming counsel. Left unresolved in this Court's Order was

the question of whether W & S could be allowed fees for such transition services, although the Court recognized that "implicit in the Order was the expectation that the law firms would continue to provide legal services to the Debtors' estates during the transition period." *In re Amdura Corp.*, *supra*, 121 B.R. at 870. Separate consideration must now be given to the propriety of the billings for such services.

The Court's analysis above concerning the allowance of billings for the time spent on the disqualification issue is equally applicable here. The Court must weigh the need for attorney discipline against the equities of the case. *In re Roberts, supra.*

The transition time was an unfortunate consequence of this Court's July 6, 1990 Order. It was clearly necessary in order to effect an orderly transition. To the extent that W & S was diligent in identifying memos and other documents and turning over such records to incoming counsel, there was an opportunity to avoid duplication of services by the new attorneys. The Court was also advised that an agreement was reached by the Debtors with new counsel pursuant to which new counsel were not to bill for the time necessary for them to get up to speed in the cases.

At the time the disqualification order entered W & S was involved in handling a number of significant matters which did not involve confrontation with the interests of the Bank Group. There were pending and uncompleted sales of the assets of the Amdura subsidiaries, unresolved questions concerning the PBGC claims, many unanswered questions revolving around the Coast franchisees, etc., etc. These issues had to be handled by counsel appointed to replace W & S, and a smooth transition was critical. The Court is satisfied that reasonable efforts were made by W & S to effect this transition.

The Court must also take into account the fact that its order of disqualification was prospective in order to give the Debtors time to find new counsel. Thus, the Court tacitly invited W & S and F & W to remain active on behalf of the Debtors during the transition, although without any

direct promise of payment. *In re Amdura, supra,* 121 B.R. at 870.

In the billing category captioned "Transition/Substitute Counsel," W & S has billed an aggregate of $6,548.00. This is by no means all of the billings between the time of the entry of the July 6 order and July 27, 1990 (the effective date of the order withdrawing the order authorizing the employment of W & S), but is the time spent in making the actual transition. There are additional billings of $17,888.00 in the category "Transition Post 8/10" which pertains to transition services. The Court finds that these services were necessary and beneficial to the estate and that the billings for these services should be allowed.

### E. *Permian Anchor Factors.*

The factors referred to above arising out of the *Permian Anchor* case, *supra*, must be considered by the Court. The first three factors are closely related, those being (1) the time and labor required, (2) the novelty and difficulty of the questions, and, (3) the skill requisite to perform the legal service properly. In this case, the evaluation of factors two and three is rather simple. The evaluation of the first factor is more complex.

In looking at factors two and three, the Court has already commented on the fact that these proceedings, collectively, were among the largest and most complex which had been filed in this District. The variety of significant issues that arose even in the early days of the case was impressive. Resolution of those issues and the prosecution of the case for the benefit of the Debtors required the attention of legal counsel well-versed in the bankruptcy law and skilled in the prosecution of reorganization cases.

The evaluation of the first factor—the time and labor required—is essentially the first step in the "lodestar" analysis espoused by the Supreme Court in the *Blanchard v. Bergeron* case, *supra*. In utilizing that approach, the Court, in fixing fees, should first determine the number of hours which should reasonably have been

required for skilled counsel to provide the required services.

Utilization of the "lodestar" in setting fees for debtors' counsel in large reorganization proceedings is, for the Court, very nearly impossible. This is particularly true when all that the Court has as a record for such purpose is the attorney's time records and his testimony concerning the services he provided in the case.

The Court's difficulty stems from the fact that, in these kinds of proceedings, there are a multiplicity of matters being handled by the attorneys, many of which are never seen by the Court. In some instances all the Court sees is the final finished product which may, on its face, be rather simple but which might, in fact, have been accomplished only after extensive consideration of very sophisticated issues involving negotiations with opposing parties and consultation with the client. In reviewing the time records, it is difficult, if not impossible, for the Court to estimate the amount of time that should properly have been spent by the attorneys in providing the services. For example, how many hours should it reasonably take to negotiate the terms of a complex stipulation allowing the debtor to use cash collateral? How many hours are reasonable for counsel to spend in conference with his client, on the phone to opposing counsel, in communication with creditors or shareholders, in negotiating with the committees on the terms of a plan, etc.? In the abstract, these questions are incapable of answer.

On occasion an analysis can be performed by the Court to determine the amount of time being spent on a variety of rather discrete matters. If that analysis shows that the law firm is routinely spending twenty hours to prepare a rather simple pleading that might more realistically be done in ten, the Court might conclude that a similar inefficiency permeates all of the work performed thereby mandating a reduction of fees.

The Court may also, on occasion, find that the billed time appears to be inflated because too many attorneys are attending to the same problem or too much time (and how much is too much?) is being consumed in intraoffice conferences. These are factors of reason. Clearly, there are benefits to be enjoyed when legal issues are chewed over by two attorneys, but it can become an area of abuse when the attorneys routinely have intraoffice conferences on every matter.

The risk to Court and counsel in seeking to evaluate fees by the elimination of those charges which appear to involve excessive staffing or overwork by the attorneys is that it ceases to be an exercise to seek out and determine the reasonable number of hours which should have been necessary to provide the services required. Such an analysis starts with the proposition that the total number of hours spent by the attorneys marks the maximum necessary to provide the services and a "reasonable" number is arrived at by subtracting from the maximum those hours found by the Court to be objectionable. However, this approach seldom, or perhaps never, takes into account the instances when the services were provided in a uniquely low number of hours. Thus, there is no balancing.

The statutory admonition to the Court is that it is to award a "reasonable" fee for the services provided. If the Court is left to its own devices with only the fee application to guide it, the analysis will almost never, in the complex cases, result in a determination of the "reasonable" number of hours required to achieve the necessary results.

In the instant case, the fees of W & S are not subject to serious charges of inefficiency or overstaffing. The objection of the Bank Group takes issue with $953.00 for excessive staffing of interfirm meetings, $10,366.00 for excessive time on a particular task, and $24,933.00 for travel time, all out of an aggregate billing of nearly $900,-000.00.

With respect to the objection concerning travel time, this Court has already made known its views. *In re Frontier Airlines, supra.* Because counsel was located in Chicago, Illinois, and this case was in Denver, Colorado, travel by the professionals was unavoidable. Time spent in an

airplane is uncomfortable, disruptive and dangerous. It is time spent by the professional at the client's request or need, and deprives the professional either of office time which could be otherwise utilized or of the professional's personal time. The record reflects that in almost every instance the attorneys used the travel time in actively working on matters relating to this case. The total time appears to be reasonable and the necessity for the travel justified. The Court has no hesitancy in allowing these billings.

■ The hourly rates charged by the attorneys are substantial, but not disproportionate to the rates charged by other professionals in other major metropolitan areas. The question can arise concerning the propriety of W & S charging Chicago rates in Denver. This issue was also addressed by this Court in the *Frontier Airlines* opinion, *supra*. Amdura was a large reorganization proceeding which absorbed the services of virtually all of the experienced and qualified reorganization lawyers in Denver who were not conflicted out. It was not unreasonable for these Debtors to seek out-of-state counsel. In order to induce such attorneys to practice here, it is reasonable to pay them at the rate they command in the community where they reside and practice.

As concerns the reasonableness of the hours expended, it is helpful to make this evaluation in relation to the various billing categories. In doing so, certain categories, involving relatively nominal amounts of time, can be easily dealt with. Thus, the Court has no reluctance in finding the charges reasonable for the billing categories denominated respectively "Petitions, Schedules, etc.," "Automatic Stay," "Executory Contracts/Leases," "Claims Resolution," "Insurance," "Plan/Disclosure Statement," "Products Liability Issues," and "Management Agreement." The Court has already dealt with the billings under the category captioned "Transition/Substitute Counsel."

■ W & S has billed an aggregate of $159,554.00 in time under "General Administration." This is a significant amount of time in one category without any greater breakdown or specificity. However, an examination of the billing records illustrates the vast array of matters being addressed by the attorneys on a daily basis, most of which were rather quickly disposed of so that the establishment of separate billing categories was not indicated. While the Court might desire some further breakdown in a perfect fee application, the presentation made is not unacceptable and is capable of evaluation for purposes of determining the reasonableness of the hours spent. On balance, the time appears to be reasonable.

■ A total of $245,749.00 was billed in connection with the sale of assets. This is in addition to substantial billings by special counsel employed for the specific purpose of negotiating and handling the asset sales. Some questions have been raised about the necessity for the services by W & S, and the reasonableness of the hours spent, in light of the involvement of separate counsel.

The time records, and this case file, reflect that W & S remained responsible for the asset sales as they related to the bankruptcy process. The sale of the Coast business, in particular, raised a myriad of problems because of the absolute need to preserve the network of franchises. The labor unions raised innovative and troublesome roadblocks to the Coast sale because of the uncertain requirements of COBRA and 11 U.S.C. § 1114. The assets were located in a variety of states, each raising separate problems. Some of the assets involved CERCLA concerns. The Debtors, and counsel, had to deal carefully with employees in order to avoid the risk that disgruntled employees might seek retribution out of the assets. Many of these problems arose unexpectedly, or at the most inopportune time, requiring an emergency response. All of these factors, and more, contributed to the billings in this category. In light of these issues, the significant number of transactions and the dollar amount involved, the Court also finds the

billings for Liquidation of Assets to be reasonable.[2]

The last major category of services provided for the Debtors is the charge made for services related to Labor Benefits. Again, most of these charges involved work on complex, sophisticated areas where the law is unsettled and rapidly changing. Such things as the PBGC claim for unfunded pension obligations, responsibility for retiree health benefits, severance payment obligations, employee incentive plans, etc., commanded the attention of the professionals. The Court is satisfied that these matters were attended to with reasonable dispatch, and that the hours expended are not unreasonable under the circumstances.

■ This Court takes exception to the number of hours billed in one area, and that concerns the time billed in connection with the firm's fee applications in this case. All told, W & S has billed an aggregate of $98,888.00, plus expenses of $10,905.49, in the preparation of its fee applications. This time is reflected in the accounts designated "Retention/Payment of Professionals", "Transition Post 8/10" and the separate category for "Fee and Expense Application".

■ Recent reports from Congress indicate a concern that allowing attorneys to charge for the time they have spent in preparing and filing fee applications is improper. It has been the view of this Court that the fee process in these cases places an extraordinary burden on the professionals, not to mention delay in payment. Thus, this Court has been amenable to allowing fees for such services and the Fee Order so provided. In the same vein, however, the Court does not believe that the attorneys ought to be compensated for the time they would have spent in submitting similar bills to their commercial clients. In order to achieve a balance in this area the Court's practice has been to allow fees for such activities at one-half the normal rate.

*In re Kaiser Steel Corp.*, 74 B.R. 885, 896 (Bankr.D.Colo.1987).

The Court finds the billings of W & S of $98,888.00 for its fee applications to be remarkable and clearly excessive. The allowance of fees for the presentation of fee applications starts with the premise that the professional has a record keeping system consistent with the need to produce, quickly and efficiently, detailed time and billing statements. What the Court does not expect is to have $250 per hour senior partners spending seventy (70) hours in the month of October 1990 alone on the "preparation of itemized monthly billing and expense statements." Both the time and the charges, therefore, must be regarded as wholly unreasonable.

This Court has done a survey of the various professionals, fee applications in this case to determine the range of charges made for the presentation of their fee applications. Many have not charged anything at all. F & W billed $7,046.00 which was charged at the 50% rate of $3,523.00. Morrison & Forester billed an aggregate of $9,083.00 on fee applications of $1,300,-900.00. These are representative. From this comparison the Court concludes that a reasonable number of hours, billed at one-half the firm's normal billing rate, would result in a fee of not more than $7,500.00 which is the fee which will be allowed for these services.

The other *Permian Anchor* factors are more easily dealt with. W & S has represented that, because of the time demands of this case, they were required to forego some other legal work. Indeed, two of the attorneys spent almost full time in Denver working on the case. This Court has already discussed the time limitations which frequently attended the performance of the services in this case, as well as the fact that the amount involved was substantial.

In some sense, the fees for debtor's counsel in reorganization cases such as these are always "contingent" because they are always subject to being second-

---

**2.** The billings in this area remain subject to reduction in the aggregate amount of $35,936.00 for services which involved issues impacting the financial interests of the Bank Group, as specified above.

guessed by all parties in the case as well as the Court at the conclusion of the case. Also, there is no "customary" fee for cases of this nature, except that the Court might observe that the hourly rates charged by the attorneys at W & S certainly fall within the range of reasonable rates for attorneys of the skill and ability of those who provided services in this proceeding. Certainly, the experience, reputation and ability of the attorneys were in keeping with the skill levels required to perform the legal services provided.

In addition to finding that the time and charges were reasonable, with the exception noted, the Court also finds that the services for which fees are being allowed were necessary and beneficial to the estates, again, with one exception. That exception relates to the charges in connection with the motion to appoint an examiner.

The examiner motion was presented for only one supportable reason, and that was to whitewash W & S's undisclosed allegiance to the Continental. The argument initially presented in favor of the motion was that it was required because neither W & S nor F & W could be expected to review the validity of the Bank's loans. We now know that was not the case, that in fact F & W could have performed this service. *In re Amdura, supra,* 121 B.R. 868–69. Also, the suggestion that new management needed an examiner to do an independent review of the activities of old management is without merit in light of the fact that the motion for an examiner was withdrawn after the entry of the disqualification order. There was simply no need for this motion, and no benefit to the estate from it.

The time pertaining to the appointment of an examiner is included in the General Administration billings. Adding the gross billing for every entry which includes time on this matter results in an aggregate charge of $22,458.00. Mr. Nachman has estimated the time for this matter at $10,-000.00. The Court does not know how this estimate was arrived at. To be sure, the figure of $22,458.00 includes some non-examiner time. But, considering the importance of the examiner issue to W & S and the fact that the billings in this case indicate that when the direct interests of W & S were involved, the time tended to escalate dramatically, the estimate of $10,-000.00 appears to be too low. The Court will split the difference and allocate $16,-229.00 to the examiner issue, and that amount will be deducted from the "unallocated" billings under General Administration.

F. *Allowance of Out–of–Pocket Expenses.*

W & S has sought an aggregate of $111,-153.24 for reimbursement for out-of-pocket expenses. Out of this amount the Bank Group has objected to the allowance of $16,891.00 as representing charges which properly should be absorbed by the firm as overhead expenses and $9,804.00 for charges for which there is an inadequate explanation of the nature of the charge made.

The overhead charges in almost every instance relate to overtime charges for secretaries or for word processing. This is a delicate area for the Court. In general it is expected that attorney's fees which are charged include, not only the legal services, but also the necessary written work produced. Thus, charges for clerical services are not usually allowable.

Where the burdens of work and the clients' needs mandate that documents must be produced after normal working hours, the law firm is put to additional costs. It is not uncommon for firms to charge the excess costs of overtime services for word processing and secretarial work to the client.

In allowing such items to be recovered from a debtor's estate, the problem comes in knowing whether the overtime work is solely attributable to the needs of the debtor, or whether the debtor has been subjected to a prioritizing by the attorneys such that clerical work for other clients has been performed during normal working hours and the clerical work for the debtor allocated to overtime hours. In this case W & S has certified in its fee application that the

charges for overtime services were incurred in circumstances where the clerical staff had been involved in working on the Debtors' matters during the day and were required to stay late because of the urgent need for the particular documents.

This Court is well aware that the exigencies of this case resulted in long hours being worked by the professionals. Inevitably that means similar demands have been placed on the firm's nonprofessional staff. In this case, considering its size and complexity and the fact that W & S has its principal office in Chicago and, with due regard to the certification made by W & S in its application, the Court finds that the charges for overtime are not unreasonable and may be allowed.

Similarly, with respect to the objections made to charges for items lacking sufficient description, the Court observes that these objections go primarily to objections to travel expense. Again, a certification has been made that the charges were incurred by the professionals and billed at the actual rates and in accordance with this Court's guidelines under its Fee Order.

■ The allowance of out-of-pocket expenses to professionals presents a particularly delicate area. When the Court has dealt with fee applications for Chapter 7 trustees, for example, the Court has been concerned with the potential for trustees to avoid the fee limitations imposed by section 324 of the Code by the expedient of billing for a variety of out-of-pocket expenses which are fundamentally overhead items. *See, In re Orthopaedics Technology, Inc., supra.* Inquiry into out-of-pocket expenses on a fairly detailed basis is particularly appropriate when the Court is faced with an application where the out-of-pocket charges begin to equal or exceed the charges for professional services.

In large reorganization cases the relationship of out-of-pocket expenses to total billings is quite different. Here the recovery sought for out-of-pocket expenses equates to approximately eleven percent of the aggregates fees and reimbursement sought by W & S.

■ This is not to say that the Court should be insensitive to the out-of-pocket charges made by professionals. Neither the Court, the creditors nor the public should tolerate having professionals dine on caviar while the creditors dine on crow. Neither should the Court permit counsel to augment hourly rates by the inclusion of items properly chargeable to overhead unless there is some showing that such charges are routinely made and that the totality of the charges for the hourly rate and overhead items is consistent with the standard compensation for professionals in the locale. *Missouri v. Jenkins,* 491 U.S. 274, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989).

The Court has reviewed the out-of-pocket billings made by W & S in this case and is satisfied that the firm has not sought to inflate its fee application by the pass-through of unwarranted overhead items to the clients. The out-of-pocket expense items, further, were billed and documented in a manner substantially consistent with the views of this Court and the Fee Order entered herein.

The Court has determined in this opinion and order that certain fees sought by W & S ought not to be allowed. The aggregate amount of that disallowance is $340,657.00 out of a total fee application of $873,569.00.

■ It is apparent in reviewing the statements for out-of-pocket fees and expenses, that many of the expenses relate to legal services for which compensation is to be denied. For example, there is travel expense, telephone calls, overhead secretarial time, copying expenses, etc. that pertains to such matters as cash collateral, the examiner motion, the retention of W & S as counsel and the application for fees. The Court is unable to determine with any degree of certainty which expenses are directly applicable to such categories. Under these circumstances it is reasonable and appropriate that the overall application for out-of-pocket expenses be disallowed in the same proportionate amount as the fees. Accordingly, the out-of-pocket allowance will be allowed in the aggregate sum of $67,803.00 with similar proportionate adjustments to be made among the Debtors

and the "unallocated" out-of-pocket charges.

### G. *Credit for Payments Received.*

Pursuant to this Court's Fee Order, the professionals were permitted to bill the Debtors on a monthly basis and be paid 75% of their fees and 100% of their out-of-pocket expenses. Pursuant to that procedure W & S has been paid the aggregate amount of $596,101.00.

Prior to the filing of this case W & S had received from the Debtors a retainer. On the date of the filing of the petition W & S held, in the retainer account, the sum of $146,142.00. Interest was earned on the retainer balance in the amount of $3,018.00.

When the first fee application was filed by W & S, it included billings for the approximately four day period prior to the filing of the case in the amount of $72,-039.00 and out-of-pocket expenses for that same period of $10,660.00. When the final fee application was filed, W & S recognized that it was not proper to seek compensation under section 330 of the Code for services provided prior to the filing of the bankruptcy case and the engagement of W & S as counsel for the Debtors-in-possession. Accordingly, in that fee application the aggregate amount of fees being requested was reduced by $72,039.00 and the out-of-pocket expenses similarly reduced by $10,660.00. Mr. Nachman explicitly testified to this reduction in his direct examination at the fee hearing.

What Mr. Nachman did not testify to as a part of his direct examination was the fact that, not only had the fees and expenses been reduced, but the retainer had similarly been reduced. Thus the reduction in billings was effected by the expedient of the postpetition payment, out of the retainer held by W & S, of the prepetition charges. That fact was elicited from Mr. Nachman on cross-examination by counsel for the Bank Group.

 Once the case was filed the retainer held by W & S became property of the estate and could only be used to pay fees and expenses allowed by the Court. *In re NBI, Inc.*, 129 B.R. 212 (Bankr.D.Colo.

1991). The postpetition allocation of a portion of the retainer to the payment of the prepetition fees and expenses is improper. Accordingly, there shall be included as a credit to the payment of the postpetition fees and expenses the additional sum of $82,699.00.

### V.

### FINAL ORDER

The Bank Group has urged the Court to defer entering an order allowing fees to W & S until such time as all final fee applications are heard. The Bank Group argues that, until all of the fees are considered, the Court will be unable to determine whether there has been an unjustified overlapping of billing among firms such that the Debtors have been required to pay an unreasonable fee for the totality of the services provided.

At the time of the fee hearing, the Court was not without sympathy to the view of the Bank Group. There were areas within the W & S billing that must be considered in light of other applications. For example, time spent by W & S in the fulfillment of the sale of assets of Coast and ANDCO are areas where there may be some ultimate duplication. There could have been similar concerns in reviewing the fee applications of successor counsel. Since the time of the hearing on the W & S fees, final fee applications have been filed by the professionals in the Amdura and Coast cases. Many of the applications have also been filed in the ANDCO case. The Court believes that it is now sufficiently advised to be able to make a final evaluation of the allowance of fees to W & S. Accordingly, this order shall be a final fee order for purposes of 11 U.S.C. § 330.

### VI.

### CONCLUSION AND ORDER

Having fully considered the evidence in these matters, the objections of the Bank Group and the positions stated by the other parties in interest, it is

ORDERED that the Court hereby allows fees and expenses to W & S in the following amounts apportioned as follows:

| Debtor | Allowed Fees | Allowed Expenses | Total |
|---|---|---|---|
| AMDURA | $ 37,514.00 | $ 1,519.00 | $ 39,033.00 |
| ANDCO | 68,255.00 | 349.00 | 68,604.00 |
| Coast | 237,398.00 | 5,385.00 | 242,783.00 |
| Coast Am. | 690.00 | | 690.00 |
| Coast Hold. | 698.00 | | 698.00 |
| Intertrade | 695.00 | | 695.00 |
| Unalloc. | 187,662.00 | 60,550.00 | 248,212.00 |
| Totals | $ 532,912.00 | $ 67,803.00 | $ 600,715.00 |

and it is

FURTHER ORDERED, that there shall be credited against the fees hereby allowed the amounts paid to W & S as interim allowances plus the retainer paid to W & S prepetition and held by the firm at the date of the filing of these proceedings, plus interest earned therein in the amount of $3,018.00, with such credits to be allocated among the Debtors in the manner previously credited by W & S (adjusted for the reallocation of the balance of the retainer as specified herein), as follows:

## PAYMENT ALLOCATION

| Debtor | Retainer | Interim Payments |
|---|---|---|
| Amdura | $ 66,461.00 | $ 103,090.00 |
| ANDCO | | 171,009.00 |
| Coast | | 322,003.00 |
| Coast Am. | | |
| Coast Hldgs. | | |
| Intertrade | | |
| Unallocated | 82,699.00 | |

and it is

FURTHER ORDERED, that W & S shall, within fifteen (15) days from the date of entry of this order, refund to the Debtors the sum of $144,547.00, representing the amount by which the total payments made to W & S. exceed the aggregate fees allowed by this order, with such funds to be reallocated among the Debtors in a manner consistent with this order and the Court's Fee Order; and it is

FURTHER ORDERED, that the allowed fees designated as "unallocated" shall be paid and allocated among the Debtors as mandated by this Court's Order entered July 31, 1990.

EXHIBIT A
RESTATED ALLOCATION OF FEES (BY MATTER)
AND DISBURSEMENTS, BY ESTATE AND UNALLOCATED,
FOR THE PERIOD APRIL 2, 1990 THROUGH MAY 31, 1991

| | AMDURA | ANDCO | COAST | COAST-AMERICA | COAST-HOLDINGS | INTER-TRADE-CARGO | UNALLO-CATED | TOTAL |
|---|---|---|---|---|---|---|---|---|
| General Administration | $19,672.25 | $21,071.00 | $ 27,264.00 | $ — | $ — | $ — | $ 91,546.78 | $159,554.03 |
| Cash Collateral/ | 1,044.50 | 21,982.75 | 19,440.75 | — | — | — | 50,630.75 | 93,098.75 |
| DIP Financing Petitions, Schedules, Etc. | 167.50 | 1,970.00 | 2,240.00 | 690.50 | 698.00 | 694.50 | 5,597.50 | 12,058.00 |
| Automatic Stay | 5,542.50 | 22.50 | 1,012.50 | — | — | — | — | 6,577.50 |
| Executory Contracts/ Leases | 114.50 | 2,720.50 | 2,089.00 | — | — | — | 1,269.50 | 6,193.50 |
| Liquidation of Assets | 399.00 | 31,155.50 | 212,174.50 | | | — | 2,020.00 | 245,749.00 |
| Claims Resolution | 965.00 | 2,852.50 | 4,970.00 | — | — | — | 1,885.00 | 10,672.50 |
| Insurance | — | — | — | — | — | — | 1,380.00 | 1,380.00 |
| Labor Benefits | 6,265.00 | 11,339.13 | 13,251.63 | — | — | — | 64,179.25 | 95,035.01 |
| Retention/Payment of Professionals | 491.75 | 2,371.50 | 3,648.50 | — | — | — | 35,010.50 | 41,522.25 |
| Plan/Disclosure Statement | — | 986.00 | 170.00 | — | — | — | 13,921.50 | 15,077.50 |
| Product Liability Issues | 1,187.50 | — | — | — | — | — | 560.00 | 1,747.50 |
| July 6 Order— Appeal | — | — | — | — | — | — | 68,134.00 | 68,134.00 |
| Transition/ Substitute Counsel | 1,957.50 | 375.00 | — | — | — | — | 4,216.00 | 6,548.50 |
| Management Agreement | 125.00 | — | — | — | — | — | 900.00 | 1,025.00 |
| Transition Post 8/10 | 1,573.00 | 1,835.00 | 10,518.00 | — | — | — | 13,518.00 | 27,444.00 |
| Fee and Expense Application | — | — | — | — | — | — | 81,752.00 | 81,752.00 |
| Total Fees | 39,505.00 | 98,681.38 | 296,778.88 | 690.50 | 698.00 | 694.50 | 436,520.78 | 873,569.04 |
| Total Disbursements | 2,489.65 | 572.35 | 8,827.64 | — | — | — | 99,263.60 | 111,153.24 |
| Total Fees and Disbursements | $41,994.65 | $99,253.73 | $305,606.52 | $ 690.50 | $ 698.00 | $ 694.50 | $535,784.38 | $984,722.28 |

EXHIBIT B
SUMMARY OF FEES AND EXPENSES REQUESTED TO BE ALLOWED
AND PAID, BY ESTATE AND UNALLOCATED,
FOR THE PERIOD APRIL 2, 1990 THROUGH MAY 31, 1991

| | AMDURA | ANDCO | COAST | COAST AMERICA | COAST HOLDINGS | INTER-TRADE CARGO | UNALLOCATED |
|---|---|---|---|---|---|---|---|
| • Total Fees Requested | $ 39,505.00 | $ 98,681.38 | $296,778.88 | $ 690.50 | $ 698.00 | $ 694.50 | $436,520.78 |
| • Total Expenses Requested | 2,489.65 | 572.35 | 8,827.64 | — | — | — | 99,263.60 |
| Total Fees and Expenses Requested | 41,994.65 | 99,253.73 | 305,606.52 | 690.50 | 698.00 | 694.50 | 535,784.38 |
| • Less Retainer | 66,460.75 | — | | | | | |
| • Less Interim Allowances Received (12/19/90) | 103,090.49 | 170,625.02 | 320,930.64 | — | — | — | — |
| • Less Interim Payments Received | — | 382.93 | 1,072.09 | — | — | — | — |
| • Less Proposed Reduction | | | | | | | |
| • Balance to be Paid | $(127,556.59) | $(71,754.22) | $(16,396.21) | $ 690.50 | $ 698.00 | $ 694.50 | $535,784.38 |

$465,688.38